IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WILDEARTH GUARDIANS<br>312 Montezuma Ave.<br>Santa Fe, NM 87501<br><br>SAN JUAN CITIZENS ALLIANCE<br>1022 1/2 Main Ave.<br>Durango, CO 81302<br><br>      Plaintiffs,<br><br>      v.<br><br>STEPHEN L. JOHNSON, IN HIS OFFICIAL<br>CAPACITY AS ADMINISTRATOR,<br>UNITED STATES ENVIRONMENTAL PROTECTION<br>AGENCY<br>Ariel Rios Building<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460<br><br>      Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1. This is an action under § 304(a)(2) of the Clean Air Act ("CAA" or "Act"), 42 U.S.C. § 7604(a)(2), to compel the Administrator of the United States Environmental Protection Agency to perform required acts or duties under §§ 111(b)(1)(B), 112(d)(6), and 112(f)(2) of the CAA, 42 U.S.C. §§ 7411(b)(1)(B), 7412(d)(6) and 7412(f)(2), that are not discretionary. Plaintiffs seek to compel the Administrator to comply with nondiscretionary duties to review, revise and promulgate air pollution control standards for oil and natural gas production, processing, transmission and storage operations that contribute significantly to air pollution, including high ozone levels and global warming, which adversely affects public health and welfare, and the environment.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 7604(a)(2).

3. The events or omissions giving rise to the claims in this case occurred in the District of Columbia. The Defendant officially resides in the District of Columbia. Therefore, venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) & (2).

4. By certified letter dated July 2, 2008, Plaintiffs San Juan Citizens Alliance ("SJCA"), Rocky Mountain Clean Air Action (the predecessor in interest to Plaintiff WildEarth Guardians), and others gave the Administrator notice of this action pursuant to 42 U.S.C. § 7604(b)(2).

## PARTIES

5. Plaintiff WildEarth Guardians is a nonprofit corporation organized and existing under the laws of the State of New Mexico. On September 15, 2008, WildEarth Guardians merged with Rocky Mountain Clean Air Action ("RMCAA"), a Colorado nonprofit membership corporation. RMCAA merged into WildEarth Guardians, and, as the surviving corporation, WildEarth Guardians acquired the rights, privileges, and interests of RMCAA, including its membership. WildEarth Guardians has members throughout the states of Colorado, Montana, New Mexico, and Wyoming that are adversely affected by air pollution from oil and gas operations and by Administrator Johnson's failure to timely review, revise and promulgate air quality standards for oil and gas operations.

6. Plaintiff SJCA is a nonprofit organization based in Durango, Colorado with offices in Cortez, Colorado and Farmington, New Mexico. SJCA has over 500 members, with

numerous members residing in San Juan County, New Mexico. SJCA is a grass roots organization dedicated to social, economic and environmental justice in the San Juan Basin. SJCA organizes San Juan Basin residents to protect the region's water and air, public lands, rural character, and unique quality of life while embracing the diversity of the region's people, economy and ecology. SJCA achieves its organizational purposes, in part, through ensuring the proper implementation of the nation's environmental and land management laws. SJCA and its members have documented and attempted to reduce the impacts of oil and gas development across the San Juan Basin since 1986. Members of SJCA are adversely affected by air pollution from oil and gas operations in the San Juan Basin and by Administrator Johnson's failure to timely review, revise and promulgate air quality standards for oil and gas operations under the CAA.

7. Defendant Stephen L. Johnson is the Administrator of the United States Environmental Protection Agency within the meaning of Section 302(a) of the Act, 42 U.S.C. § 7602(a), against whom any person may commence a civil action under § 304(a)(2) of the Act, 42 U.S.C. § 7604(a)(2), where there is alleged a failure of the Administrator to perform any act or duty under the Clean Air Act which is not discretionary with the Administrator. As the Administrator of EPA, Johnson is responsible for complying with the nondiscretionary duties to review, revise and promulgate regulations that are the subject of this action. Johnson is sued in his official capacity.

**STATUTORY AND REGULATORY BACKGROUND**

8. In enacting the CAA, Congress sought "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1).

### New Source Performance Standards

9. To help achieve this goal, Section 111 of the CAA requires the Administrator to establish and update standards of performance for new and newly modified sources of pollutant emissions. See 42 U.S.C. § 7411.

10. Section 111(b)(1)(A) requires EPA to compile a list of categories of stationary sources which, in the judgment of the Administrator, "cause[], or contribute[] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7411(b)(1)(A).

11. For each source category identified pursuant to § 111(b)(1)(A), § 111(b)(1)(B) requires EPA to promulgate standards of performance for new and modified sources within the source category, commonly known as "New Source Performance Standards" or "NSPS." 42 U.S.C. § 7411(b)(1)(B).

12. New Source Performance Standards must reflect "the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated." 42 U.S.C. § 7411(a)(1). These standards are commonly known as "Best Demonstrated Technology" or "BDT".

13. New Source Performance Standards become applicable to an existing facility within a designated source category which undertakes a modification after the publication of a NSPS applicable to that source category. See 42 U.S.C. § 7411(a)(2). The CAA defines "modification" broadly as "any physical change in, or change in the method of operation . . .

which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." 42 U.S.C. § 7411(a)(4).

14. In order to ensure that NSPSs continue to impose BDT as emission control technologies evolve, Congress required the Administrator to "review, and if appropriate, revise" the standards "at least every 8 years." 42 U.S.C. § 7411(b)(1)(B). The Administrator may be excused from the nondiscretionary duty to review and revise NSPSs only if "the Administrator determines that such review is not appropriate in light of readily available information on the efficacy of such standard." Id.

15. In 1979, EPA listed Crude Oil and Natural Gas Production on its "priority list" of source categories which it determined "cause[], or contribute[] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7411(b)(1)(A); 44 Fed. Reg. 49222 (August 21, 1979) (codified at 40 C.F.R. § 60.16).

16. EPA listed Crude Oil and Natural Gas Production as Number 29 on its prioritized list of 59 source categories slated for NSPS development. 44 Fed. Reg. at 49225-26.

17. The Crude Oil and Natural Gas Production source category encompasses a wide range of equipment and associated emission units located at wellheads, compressor stations, gas processing plants and intermediate locations, including tanks, pumps, compressors, pneumatic devices, dehydrators, sweetening units, sulfur recovery units, and separators.

18. The equipment and associated emission units in the Crude Oil and Natural Gas Production source category emit significant amounts of numerous air pollutants, including volatile organic compounds ("VOCs"), nitrogen oxides, sulfur dioxide ("$SO_2$"), methane, carbon dioxide, and a number of hazardous air pollutants ("HAPs") discussed below.

19. By listing Crude Oil and Natural Gas Production as a source category under CAA § 111(b)(1)(A), EPA triggered the requirement to promulgate NSPSs for sources within the source category. 42 U.S.C. § 7411(b)(1)(B).

20. In 1985, EPA promulgated NSPSs for a limited number of the air pollutants emitted by a limited subset of the emissions units included in the Crude Oil and Natural Gas Production source category. Specifically, EPA promulgated NSPSs for VOC emissions from leaking equipment at natural gas processing plants (Equipment Leaks of VOCs From Onshore Natural Gas Processing Plants, 50 Fed. Reg. 26122 (June 24, 1985) (codified at 40 C.F.R. Part 60, Subpart KKK)), and for emissions of $SO_2$ from natural gas processing plants (Onshore Natural Gas Processing $SO_2$ Emissions, 50 Fed. Reg. 40158 (October 1, 1985) (codified at 40 C.F.R. Part 60, Subpart LLL)).

21. EPA has never established NSPSs for operations within the Crude Oil and Natural Gas Production source category that are not located at natural gas processing plants or for those pollutants other than VOCs and $SO_2$ emitted by operations within the Crude Oil and Natural Gas Production source category.

22. Although required to do so "at least every 8 years," 42 U.S.C. § 7411(b)(1)(B), EPA has not reviewed or revised its NSPSs for the Crude Oil and Natural Gas Production source category within the last 8 years or at any other time since originally promulgating the limited requirements for natural gas processing plant VOC and $SO_2$ emissions in 1985.

23. EPA has not within the last 8 years or at any other time since originally promulgating the limited NSPSs in 1985 determined that review of such standards is "not appropriate in light of readily available information on the efficacy of such standard[s]." See 42

U.S.C. § 7411(b)(1)(B). EPA could not lawfully make such a determination for the NSPSs for the Crude Oil and Natural Gas Production source category today.

24.     EPA's failure to review and revise the NSPSs for the Crude Oil and Natural Gas Production source category has resulted in outdated standards that do not reflect BDT today and fail to control emissions of numerous pollutants from numerous emission units.

National Emission Standards for Hazardous Air Pollutants

25.     Section 112 of the CAA requires EPA to promulgate regulations requiring control of emissions of HAPs from major sources. 42 U.S.C. § 7412.

26.     In § 112(b), Congress established an initial list of HAPs, which EPA must periodically review and revise. 42 U.S.C. § 7412(b).

27.     Section 112(c)(1) requires EPA to publish a list of all categories and subcategories of major sources of the HAPs included in the § 112(b) list. 42 U.S.C. § 7412(c)(1).

28.     EPA must establish emission standards under § 112(d) for each category and subcategory of major sources of HAPs listed by EPA under § 112(c)(1). 42 U.S.C. §§ 7412(c)(2), (d). These standards are commonly known as "Maximum Achievable Control Technology" or "MACT". The required emission standards "shall require the maximum degree of reduction in emissions of the hazardous air pollutants subject to [Section 112] (including a prohibition on such emissions, where achievable) that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for new or existing sources in the category or subcategory . . . ." 42 U.S.C. § 7412(d)(2).

29. Section 112(d)(6) of the Act mandates that EPA "shall review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under [Section 112] no less often than every 8 years." 42 U.S.C. § 7412(d)(6).

30. In 1992, EPA included "Oil and Natural Gas Production" in its initial list of categories of major sources of HAPs promulgated under § 112(c)(1). 57 Fed. Reg. 31576 (July 16, 1992).

31. EPA subsequently divided the original Oil and Natural Gas Production major source category into two separate major source categories—Oil and Natural Gas Production and the newly created Natural Gas Transmission and Storage major source category. 63 Fed. Reg. 7155 (February 12, 1998).

32. Significant quantities of HAPs, including benzene, toluene, ethyl-benzene, mixed xylenes and n-hexane are emitted by operations included in these major source categories. 64 Fed. Reg. 32610 (June 17, 1999). Benzene is a known human carcinogen, and, each of these HAPs causes serious adverse impacts to human health. Id. at 32610-12.

33. On June 17, 1999, EPA promulgated under § 112(d) its NESHAPs for the Oil and Natural Gas Production and the Natural Gas Transmission and Storage major source categories. 64 Fed. Reg. 32610 (June 17, 1999) (codified at 40 CFR Part 63, Subparts HH and HHH).

34. The NESHAPs limit HAP emissions from some but not all emission points at major sources within the two source categories. Specifically, the NESHAPs limit emissions from certain: (1) process vents on glycol dehydration units; (2) storage vessels with flash emissions; and (3) equipment leaks at natural gas processing plants. See 64 Fed. Reg. at 32613,

32615. The NESHAPs do not limit HAP emissions from other emission points within the two major source categories, such as pneumatic devices.

35. Although required to do so "no less often than every eight years," 42 U.S.C. § 7412(d)(6), EPA has failed to review and revise the NESHAPs for the Oil and Natural Gas Production and Natural Gas Transmission and Storage major source categories in the more than 9 years since promulgation of the NESHAPs in June 1999.

36. EPA's failure to comply with its nondiscretionary duties to review, and, if necessary, revise the NESHAPs has caused oil and natural gas production facilities and natural gas transmission and storage operations to fail to meet air pollution emission standards that constitute MACT today.

## Residual Risk Standards

37. Section 112(f)(2) of the CAA requires EPA to promulgate standards, in addition to the standards promulgated under CAA § 112(d) for each category or subcategory of sources, if required to provide an "ample margin of safety to protect public health" or "to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect." 42 U.S.C. § 7412(f)(2). These standards are commonly known as "residual risk standards".

38. Section 112(f) of the Clean Air Act provides:

**(1) Report**

Not later than 6 years after November 15, 1990, the Administrator shall investigate and report, after consultation with the Surgeon General and after opportunity for public comment, to Congress on—

(A) methods of calculating the risk to public health remaining, or likely to remain, from sources subject to regulation under this section after the application of standards under subsection (d) of this section;

9

    (B) the public health significance of such estimated remaining risk and the technologically and commercially available methods and costs of reducing such risks;

    (C) the actual health effects with respect to persons living in the vicinity of sources, any available epidemiological or other health studies, risks presented by background concentrations of hazardous air pollutants, any uncertainties in risk assessment methodology or other health assessment technique, and any negative health or environmental consequences to the community of efforts to reduce such risks; and

    (D) recommendations as to legislation regarding such remaining risk.

**(2) Emission Standards**

    (A)    If Congress does not act on any recommendation submitted under paragraph (1), the Administrator <u>shall</u>, within 8 years after promulgation of standards for each category or subcategory of sources pursuant to subsection (d) of this section, promulgate standards for such category or subcategory if promulgation of such standards is required in order to provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990) or to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect.  Emission standards promulgated under this subsection shall provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990), unless the Administrator determines that a more stringent standard is necessary to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect.  If standards promulgated pursuant to subsection (d) of this section and applicable to a category or subcategory of sources emitting a pollutant (or pollutants) classified as a known, probable or possible human carcinogen do not reduce lifetime excess cancer risks to the individual most exposed to emissions from a source in the category or subcategory to less than one in one million, the Administrator <u>shall</u> promulgate standards under this subsection for such source category.

    (B)    \*\*\*

    (C)    The Administrator <u>shall</u> determine whether or not to promulgate such standards and, if the Administrator decides to promulgate such standards, <u>shall</u> promulgate the standards 8 years after promulgation of the standards under subsection (d) of this section for each source category or subcategory concerned. . . .

42 U.S.C. § 7412(f) (emphases added).

39. Pursuant to § 112(f)(1), EPA submitted a report to Congress in March 1999. That report did not include any recommendations for legislation regarding residual risk, so Congress took no action. Accordingly, for each source category subject to emission standards under § 112(d), EPA must — within eight years of promulgating § 112(d) standards for that category — determine whether to promulgate residual risk standards pursuant to § 112(f)(2)(A). 42 U.S.C. § 7412(f)(2)(C). If EPA decides to promulgate such standards for that category, it must do so within eight years of promulgating § 112(d) standards for that category. 42 U.S.C. § 7412(f)(2)(A), (C).

40. EPA was required to determine whether to promulgate residual risk standards for the Oil and Natural Gas Production and Natural Gas Transmission and Storage major source categories within eight years after it promulgated the § 112(d) NESHAPs for those source categories in June 1999.

41. If EPA decided to promulgate residual risk standards for the Oil and Natural Gas Production and Natural Gas Transmission and Storage major source categories, it was required to promulgate such standards within eight years after it promulgated the § 112(d) standards for those source categories in June 1999.

42. Although the eight year deadline has passed, EPA has neither determined whether to promulgate residual risk standards for the Oil and Natural Gas Production and Natural Gas Transmission and Storage major source categories, nor promulgated residual risk standards for those source categories. Defendant has thereby failed to perform nondiscretionary duties within the meaning of § 304(a)(2), 42 U.S.C. § 7604(a)(2).

## HARM TO PLAINTIFFS CAUSED BY EPA'S FAILURES TO COMPLY WITH NONDISCRETIONARY DUTIES.

43. Air pollution from oil and gas operations within the source categories described above ("Oil and Gas Operations"), and the Administrator's failure to review, revise and promulgate air pollution control standards for Oil and Gas Operations has caused, continues to cause and threatens to cause further injury to Plaintiffs and their members for which there is no adequate remedy at law.

44. Members of SJCA and WildEarth Guardians reside, work, travel and recreate near Oil and Gas Operations. As a consequence, these members breathe pollutants emitted by those operations.

45. Plaintiffs' members also breathe pollutants emitted by Oil and Gas Operations that have been transported by air currents to areas where Plaintiffs' members reside, work, travel and recreate.

46. Emissions of air pollutants, including volatile organic compounds and nitrogen oxides, from Oil and Gas Operations are contributing to high ozone levels in areas where Plaintiffs' members reside, work, travel and recreate.

47. At ground level, ozone is harmful to public health, especially impacting the young, the elderly and people with pre-existing conditions. Ozone triggers asthma attacks in susceptible individuals, and affects otherwise healthy people who work or exercise outdoors, causing breathing difficulties, eye-irritation and reduced resistance to lung infections and colds.

48. Hazardous air pollutants emitted by Oil and Gas Operations, including benzene, toluene, ethyl benzene and xylene put Plaintiffs' members at increased risk of cancer and other adverse consequences to human health.

49. Oil and Gas Operations are the second largest source of anthropogenic methane emissions.

50. Methane is more than twenty (20) times more effective in trapping heat in the atmosphere than carbon dioxide ($CO_2$).

51. Uncontrolled methane emissions from Oil and Gas Operations are a significant contributor to climate change which injures and threatens to cause further injury to Plaintiffs and their members in a number of ways.

52. Adverse impacts from climate change include exposing Plaintiffs' members to an increase in frequency of severe storm events, periods of high heat and drought, limiting the availability of scarce water resources in areas where Plaintiffs' members reside, exacerbating ozone levels, and increasing exposure to disease spread by certain vectors.

53. In addition to causing adverse public health impacts, pollutants emitted by Oil and Gas Operations cause environmental harm by, among other things, causing death, illness and impaired reproductive success in wildlife, fish and plants.

54. Further, through contributing to climate change, pollutants emitted by Oil and Gas Operations adversely impact ecosystems, and the plants and animals that inhabit ecosystems. Climate change impacts species and ecosystems by, among other things, driving species from their historic ranges, reducing available water, and increasing wildfire risks and occurrences.

55. Plaintiffs' members include numerous outdoor recreation enthusiasts who engage in a wide variety of activities including hiking, backpacking, birdwatching and other wildlife observation, gardening, flower and plant identification, edible wild plant gathering, canoeing, fishing and hunting. Among the areas where Plaintiffs' members pursue these activities are parks and preserves located near Oil and Gas Operations.

56. In addition, Plaintiffs' members engage in the above activities in areas to which pollutants from Oil and Gas Operations are transported by air currents.

57. Pollutants emitted by Oil and Gas Operations cause harm to Plaintiffs and their members by placing at risk the wildlife, fish, and plant resources that are an integral component of their recreational experiences.

58. Defendant's failure to review and revise the emission standards that are the subject of this case injures Plaintiffs and their members by depriving Plaintiffs' members of the emission reductions that would result.

59. Thus, Defendant prolongs and increases Plaintiffs members' exposure to air pollutants and their risk of adverse health effects.

60. Defendant also increases and prolongs the risk to wildlife, fish, and plant resources that are an integral component of Plaintiffs members' recreational experience.

61. Alternatively, Defendant's failure to determine that revisions to the emission standards that are the subject of this case are not appropriate or necessary injures Plaintiffs and their members.

62. Any such determination by Defendant that revisions to the emission standards that are the subject of this case are not appropriate or necessary would be judicially reviewable. 42 U.S.C. § 7607(b).

63. By not revising its standards or determining that revisions are not appropriate or necessary, Defendant deprives Plaintiffs' members of the benefits of revisions to such standards and also deprives Plaintiffs of the opportunity to seek judicial review of Defendant's failure to comply with the law.

64. Defendant's failure to review and revise the emission standards that are the subject of this case deprives Plaintiffs' members of information to which they otherwise would have access, including formally published findings by EPA on developments in practices, processes and control technologies that could reduce the emissions of hazardous air pollutants from Oil and Gas Operations.

65. If Plaintiffs and their members had access to such information, they would use it to educate the public about the control measures that are currently available to reduce emissions from operations subject to the emissions standards that are the subject of this case and to advocate for the use of such measures. By depriving Plaintiffs of such information, Defendant's failure to take the actions that are the subject of this case injures Plaintiffs and their members.

66. Defendant's failure to determine whether to promulgate residual risk standards for Oil and Gas Operations, and Defendant's failure to promulgate such standards, injures Plaintiffs and their members.

67. Plaintiffs contend that: (1) the hazardous air pollutant standards at issue in this case do not reduce to less than one in one million the lifetime cancer risk for the individual most exposed to emissions from the source categories to which such standards apply; (2) residual risk standards are necessary for Oil and Gas Operations to provide an ample margin of safety to protect public health and to prevent adverse environmental effects; and (3) the Act therefore requires EPA to promulgate residual risk standards for Oil and Gas Operations.

68. Defendant's failure to decide to promulgate and to subsequently promulgate such standards within the statutory time frame prolongs and increases Plaintiffs members' exposure to and the resulting health risks from hazardous air pollutants emitted by Oil and Gas

Operations, and threatens the wildlife, fish, and plant resources that are an integral component of Plaintiffs members' recreational experience.

69. Alternatively, Defendant's failure to determine not to promulgate residual risk standards for Oil and Gas Operations injures Plaintiffs and their members.

70. Any such determination by Defendant not to promulgate residual risk standards for Oil and Gas Operations would be judicially reviewable. 42 U.S.C. § 7607(b).

71. By not promulgating residual risk standards for such operations or making a final determination that residual risk standards are not required, Defendant deprives Plaintiffs' members of the benefits of residual risk standards and also deprives Plaintiffs of the opportunity to seek judicial review of the Administrator's decision.

72. Defendant's failure to determine whether to promulgate residual risk standards deprives Plaintiffs' members of information to which they otherwise would have access. This information includes formally published findings by EPA on whether the lifetime cancer risk for the individual most exposed to emissions from such facilities has been reduced to less than one in one million, whether existing § 112(d) standards for such facilities provide an ample margin of safety to protect public health, and whether the existing § 112(d) standards for such facilities are adequate to prevent adverse environmental effects.

73. If Plaintiffs and their members had access to such information, they would use it to educate the public about the health and environmental effects of emissions from Oil and Gas Operations and to advocate for more effective measures to reduce those emissions. If Plaintiffs' members had access to this information, they would use it in decisions on where they live, visit, work, and recreate. By depriving Plaintiffs and their members of these benefits, Defendant's failure to make the determination required by § 112(f)(2)(C) injures them.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

74. Plaintiffs restate and incorporate by reference herein the allegations of Paragraphs 1-73, above.

75. Defendant's failure to review and revise the NSPS for the Crude Oil and Natural Gas Production source category, including the standards promulgated at 50 Fed. Reg. 26122 (June 24, 1985) (codified at 40 C.F.R. Part 60, Subpart KKK), in accordance with 42 U.S.C. § 7411(b)(1)(B) constitutes a failure of the Administrator to perform an act or duty that is not discretionary with the Administrator within the meaning of 42 U.S.C. § 7604(a)(2).

### SECOND CLAIM FOR RELIEF

76. Plaintiffs restate and incorporate by reference herein the allegations of Paragraphs 1-75, above.

77. Defendant's failure to review and revise the NESHAPs for the Oil and Natural Gas Production and Natural Gas Transmission and Storage major source categories, including the standards promulgated at 64 Fed. Reg. 32610 (June 17, 1999) (codified at 40 C.F.R. Part 63, Subparts HH and HHH), in accordance with 42 U.S.C. § 7412(d)(6), constitutes a failure of the Administrator to perform an act or duty that is not discretionary with the Administrator within the meaning of 42 U.S.C. § 7604(a)(2).

### THIRD CLAIM FOR RELIEF

78. Plaintiffs restate and incorporate by reference herein the allegations of Paragraphs 1-77, above.

79. Defendant's failure to promulgate standards under 42 U.S.C. § 7412(f)(2) for the Oil and Natural Gas Production and Natural Gas Transmission and Storage major source categories, or to determine not to promulgate such standards, constitutes a failure of the Administrator to perform an act or duty that is not discretionary with the Administrator within the meaning of 42 U.S.C. § 7604(a)(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court to enter a judgment and decree in favor of Plaintiffs and against Defendant:

A. Declaring that Defendant's failure to review and revise the NSPS for the Crude Oil and Natural Gas Production source category constitutes a failure of the Administrator to perform an act or duty that is not discretionary with the Administrator within the meaning of 42 U.S.C. § 7604(a)(2);

B. Ordering Defendant to review the NSPS for the Crude Oil and Natural Gas Production source category in accordance with 42 U.S.C. § 7411(b)(1)(B) and pursuant to an expeditious deadline established by the Court;

C. Ordering Defendant either to revise the NSPS for the Crude Oil and Natural Gas Production source category or to determine that such revision is not appropriate pursuant to an expeditious deadline established by the Court;

D. Declaring that Defendant's failure to review and revise the NESHAPs for the Oil and Natural Gas Production and Natural Gas Transmission and Storage major source categories constitutes a failure of the Administrator to perform an act or duty that is not discretionary with the Administrator within the meaning of 42 U.S.C. § 7604(a)(2);

E. Ordering Defendant to review the NESHAPs for the Oil and Natural Gas Production and Natural Gas Transmission and Storage major source categories in accordance with 42 U.S.C. § 7412(d)(6), and pursuant to an expeditious deadline established by the Court;

F. Ordering Defendant either to revise the NESHAPs for the Oil and Natural Gas Production and Natural Gas Transmission and Storage major source categories in accordance with 42 U.S.C. § 7412(d)(6), or to make a final determination that such revisions are not necessary, pursuant to an expeditious deadline established by the Court;

G. Declaring that Defendant's failures to promulgate standards under 42 U.S.C. § 7412(f)(2) for the Oil and Natural Gas Production and Natural Gas Transmission and Storage major source categories, or to determine not to promulgate such standards, constitute failures of the Administrator to perform acts or duties that are not discretionary with the Administrator within the meaning of 42 U.S.C. § 7604(a)(2);

H. Ordering Defendant to promulgate standards under 42 U.S.C. § 7412(f)(2) for the Oil and Natural Gas Production and Natural Gas Transmission and Storage major source categories or make a final determination not to promulgate such standards, pursuant to an expeditious deadline specified by this Court;

I. Retaining jurisdiction of this action to ensure compliance with this Decree;

J. Awarding Plaintiffs costs of this action, including attorneys' fees; and

K. Awarding Plaintiffs such other relief as the Court deems just and proper.

Dated: January 14, 2009

              Respectfully Submitted,

              */s/ James S. Pew*
              James S. Pew (D.C. Bar No. 448830)
              Earthjustice
              1625 Massachusetts Ave., NW
              Ste. 702
              Washington, DC 20036
              (202) 667-4500
              jpew@earthjustice.org

              *Nicholas F. Persampieri (by JSP)*
              Nicholas F. Persampieri
              (CO Bar No. 37802, NM Bar No. 3209)
              Andrea L. Zaccardi
              (CO Bar No. 38089, MA Bar No. 664504)
              Earthjustice
              1400 Glenarm Place, Suite 300
              Denver, CO 80202
              (303) 623-9466
              npersampieri@earthjustice.org
              azaccardi@earthjustice.org

              Attorneys for Plaintiffs